UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| KENNETH BROOKS, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Defendant. ) | Case No.: 1:10-CV-150<br><br>Magistrate Judge William B. Mitchell Carter |

## MEMORANDUM and ORDER

This medical malpractice action is brought by plaintiff Kenneth Brooks under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346, 2671-2680 (2011), alleging that he contracted Hepatitis C from contaminated equipment used to perform a colonoscopy he received at the Alvin C. York Veterans' Affairs Hospital. Defendant has filed a motion for summary judgment asserting plaintiff cannot, under any circumstances, meet its burden to prove that plaintiff's Hepatitis C was caused by the colonoscopy [Doc. 29]. The question before the Court is whether a genuine issue of material fact exists as to this issue: is it more probable than not that the plaintiff contracted Hepatitis C from the colonoscopy rather than by some other means. Finding there is no genuine issue of material fact as to this issue, the Court GRANTS defendant's motion for summary judgment.

### I. FACTS

On September 2, 1995, while at the Battle Creek, Michigan Veterans' Affairs Hospital (Battle Creek VA Hospital), plaintiff tested positive for "HEPCAB," the Hepatitis C Virus (HCV) Antibody. The blood sample was obtained at 11:00 P.M, and sent to Cleveland Veterans'

1

Affairs Hospital in Cleveland, Ohio. (Def. Ex. A, Doc. 31-1.) Also on September 2, 1995, while at Battle Creek VA Hospital, plaintiff tested positive for a second HCV marker, "HCVAB." This second test was conducted on the same blood sample as the "HEPCAB" test, and was also sent to Cleveland Veterans' Affairs Hospital in Cleveland, Ohio. (Def. Ex. B, Doc. 31-2.) On September 4, 1995, sometime before 9:00 P.M., Plaintiff left the Battle Creek VA Hospital under an Irregular Discharge[1] Against Medical Advice. (Def. Ex. C, physician note on 9/4/1995 at 9:12 P.M. regarding irregular A.M.A. discharge, Doc. 31-3); (Def. Ex. D, physician note on 9/4/1995 at 2:50 P.M. regarding irregular A.M.A. discharge, Doc. 31-4); (Def. Ex. E, Plaintiff's certification of release at his own request and A.M.A. on 9/4/1995, Doc. 31-5).

During a psychological examination at the Battle Creek VA hospital on May 31, 1991, plaintiff reported a "21 year history of crack, marijuana, and heroin use." (Def. Ex. F, Doc. 31-6). In his deposition, plaintiff stated he was an intravenous drug user from 1974 to 1978, and he used crack cocaine from 1989 to 1994. (Kenneth Brooks dep., Def. Ex. T, at 9:7-16, June 29, 2011, Doc. 30-20.)

On June 26, 2007, Plaintiff underwent a colonoscopy at the Alvin C. York Veterans Affairs Hospital in Murfreesboro, Tennessee (York VA Hospital). (Def. Ex. I, Doc. 30-9.) On December 1, 2008, during a colonoscopy performed on a different patient at the York VA Hospital, medical personnel noted what appeared to be blood in the colonoscope's auxiliary water tubing (AWT). Subsequently, medical personnel removed the equipment from service, notified the manufacturer of their findings, and began an investigation of the incident.

---

[1] "Irregular discharge means the release of a competent patient from a VA or VA-authorized hospital, nursing home, or domiciliary care due to: refusal, neglect or obstruction of examination or treatment; leaving without the approval of the treating health care clinician; or disorderly conduct and discharge is the appropriate disciplinary action." 38 C.F.R. § 70.2 (2011).

(Report of Veterans Affairs, Office of Inspector General, Ex. J, Doc. 30-10, Page ID # 135.)

An investigation of the December 1, 2008 incident by a York VA Hospital Patient Safety Manager revealed that the AWT's proximal connector with 1-way valve had been substituted with the similar looking "washing tube" proximal connector which lacked a 1-way valve feature. (Def. Ex. J at 9-10, Doc. 30-10.) The York VA Hospital Patient Safety Manager was unable to determine if the substitution of proximal connectors was an isolated incident on December 1, 2008, or whether the substitution had occurred during other colonoscopies since the York VA Hospital adopted that specific colonoscope system on April 23, 2003. (Def. Ex. J at 10-12, Doc. 30-10.) Subsequently, the York VA Hospital decided to notify every patient who had undergone a colonoscopy at their facility while this specific colonoscope had been in service. In total, 6,387 patients were identified as having undergone a colonoscopy during this time frame, and all were offered precautionary blood testing free of charge. *Id.*

On April 9, 2009, the United States Department of Veterans' Affairs sent a letter to all 6,387 patients identified as having undergone a colonoscopy between April 23, 2003 and December 1, 2008. (Def. Ex. K, Doc. 30-11.) The letter stated in relevant part:

> This letter has been sent to you because you had an endoscopy procedure (use of a scope to check your colon) performed at Department of Veterans Affairs Tennessee Valley Healthcare System's (TVHS) Alvin C. York Campus between April 23, 2003 ,and December 1, 2008. During a review of colonoscopy procedures at the Alvin C. York facility, it was determined that one of the tubes used for irrigation during the procedure had an incorrect valve. Use of an incorrect valve creates a possibility that patients undergoing these procedures could have been exposed to a small amount of bodily fluid remaining from the previous patient's procedure. Additionally, it was discovered that the tubing attached to the scope (not the scope itself) may not have been properly cleaned between patients. Because it was not possible to rule out the possibility that one or more patients were exposed to an infection, VA decided to notify patients of the situation. This conservative approach is in the best interest of our veterans and is consistent with

> VA's policy to disclose all significant adverse events to patients. TVHS is offering you the opportunity to return to the VA for precautionary blood tests to ensure that you have not been exposed to any potentially infectious fluid. Please be aware that your colonoscopy examination and results were not affected.

*Id.*

Plaintiff was in the group of 6,387 York VA Hospital patients who received the April 9, 2009 letter. Plaintiff filed an administrative claim on September 8, 2009 against the U.S. Department of Veterans Affairs for his contraction of Hepatitis C allegedly through the York VA Hospital's "failure to clean and/or sanitize its equipment, use new equipment, or properly use the equipment in its possession." (Def. Ex. L, Doc. 30-12.)

On July 9, 2010, Kenneth Carpenter, MD at Tennessee Valley Healthcare System noted that Plaintiff had a positive HCV test in 1995 at Battle Creek, and that patient had been HCV positive for fifteen years. Dr. Kenneth Carpenter further noted in that same entry that such knowledge would be "useful in monitoring the rate of progression, if any, of his HCV." (Def. Ex. M, Doc. 30-13.)

Dr. Larry D. Schuster, plaintiff's expert, is a board certified gastroenterologist. During his deposition taken in this case, Dr. Schuster testified that the incidence of transmission rates of HVC from colonoscopies is "low." (Schuster Dep. at 9-10, Doc. 30-14). Dr. Schuster further testified:

> Q. ... You didn't actually review the machine that was used in this case, did you?
>
> A. No.
>
> Q. And what did you review to make a determination that there was a problem with the machine, how did you come to that conclusion?

A. Well, basically, there are several articles and then some of it is word of mouth exactly because any time -- we have instruments, too, and so we want to know what was going on with them to make sure that we don't have the same issues.

Q. So what did you assume was wrong with the V.A. machine in coming to your medical opinion?

A. It had to do with how they attached the water bottle to it, the attachment.

Q. And so can you describe to me what they did wrong in your understanding?

A. My understanding is that instead of the water bottle instead of a one-way valve where it keeps backflow from going in there, they used the wrong connector that allowed flow of stuff from -- you know, when they did a previous colonoscopy, it would allow flow of material, whether it's bacterial, or viral, or whatever back into the water bottle, which could go back into the next patient that had the procedure.

Q. Dr. Shuster, do you have an opinion to a reasonable degree of medical certainty about how much the risk is of that transferring hepatitis C?

A. No.

Q. Are you prepared to testify to a reasonable degree of medical certainty that that test exposed Mr. Brooks to hepatitis C?

A. Yes.

Q. And how do you come to that conclusion if you don't know what the risk factor is?

A. Because there's certainly a risk of any sort of contamination leading to, you know, to an exposure to whoever is, you know, exposed to that machinery next.

> Q. Can you testify to a reasonable degree of medical certainty that there's a greater risk from this colonoscopy than it was to the risk of having used illegal drugs?
>
> A. No.

(Schuster Dep. at 8-10, Doc. 30-14.) In his expert report, Dr. Schuster opines that plaintiff contracted Hepatitis C from the colonoscopy on April 23, 2003 because "Mr. Brooks started having hallucinations/delusions and suicidal ideations in March 2008." (Schuster Report at 1, Doc. 30-19). He further opined that "the positive Hepatitis C Ab does not prove the patient had Hepatitis C in September 2, 1995" because the rate of false positive tests for Hepatitis C using the HEPCAB test is "15% or more;" no confirmation test for Hepatitis C was given; he received no treatment or counseling for Hepatitis C or notice that he had tested positive for Hepatitis C antibodies; and none of plaintiff's VA medical records mention a history of Hepatitis C until 2009 when it is mentioned as a "new case." (Schuster Report at 1, Doc. 30-19).

Dr. Jonathan Moorman, the government's expert, is a Professor of Medicine and Chief of the Division of Infectious Diseases in the Department of Internal Medicine at the James H. Quillen College of Medicine, East Tennessee State University. According to Dr. Moorman, "Prevalence data suggest that older and former drug users such as Mr. Brooks have a 70% to 90% prevalence rate of HCV (www.cdc.gov/hepatitis/HCV/HVVfaq.htm)." (Moorman Report at 1, Doc. 30-25). Dr. Moorman also opined that "the risk for development of HCV after an endoscopic procedure would be expected to be extremely low. HCV is primarily transmitted via blood exposure, with risk for transmission following needle exposure with contaminated blood being approximately 1.8%." *Id.* Dr. Moorman also noted that a "review of [plaintiff's] medical record reveals many admissions for detoxification that include documentation of a major

6

depressive disorder that was both recurrent and associated with psychotic features such as hallucinations. These predated any knowledge of his HVC..." *Id.* Dr. Moorman concluded plaintiff's psychiatric symptoms were not related to his positive Hepatitis C test in 2008. Finally, Dr. Moorman opined, "given this individual's history and previous positive testing, it is overwhelmingly likely that he was infected [sic] HVC prior to any endoscopy. *Id.*

## II. DISCUSSION

### A. Standard of Review

FED. R. CIV. P. 56(c) provides that summary judgment will be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 475, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

7

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. The standard for summary judgment mirrors the standard for directed verdict. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Lapeer County, Mich. v. Montgomery County, Ohio*, 108 F.3d 74, 78 (6th Cir. 1997). There must be some probative evidence from which the factfinder could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252; *Bailey v. Floyd County Bd. Of Educ.,* 106 F.3d 135, 140 (6th Cir. 1997). If the Court concludes that a fair-minded factfinder could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52*; University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

B. Analysis

This is a medical malpractice action governed by the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671-2680 (2011). In the current case, pursuant to 28 U.S.C. § 1346(b)(1)[2], the

---

[2] 28 U.S.C. § 1346(b)(1) provides in relevant part that
> the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

8

substantive law governing plaintiff's claim is Tennessee's Medical Malpractice Act (TMMA), Tenn. Code Ann. § 29-26-115 (2011). The TMMA states that the plaintiff must prove three necessary elements by a preponderance of the evidence. Tenn. Code Ann. § 29-26-115 (d). Plaintiff must prove: (1) the recognized standard of acceptable professional practice in the profession . . . at the time the alleged injury or wrongful action occurred; (2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and (3) that as a proximate result of the defendant's negligent act or omission, plaintiff suffered injuries which would not otherwise have occurred. Tenn.Code Ann. § 29-26-115(a)(1)-(3); French v. Stratford House, 333 S.W.3d 546, 554-55 (Tenn. 2011). If plaintiff fails to prove any one of these three elements, defendant cannot be found liable as a matter of law. Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993); Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn. 1993).

Defendant argues plaintiff can prove no set of facts which would enable him to meet his burden to show by a preponderance of the evidence that plaintiff contracted Hepatitis C from the June 26, 2007 colonoscopy. Even assuming defendant was negligent, unless plaintiff can show by a preponderance of the evidence that but for the colonoscopy he would not have contracted Hepatitis C, then he cannot prevail in this action.[3] A negligent act on the part of the defendant is not enough. The negligent act must have *caused* the injury. As explained by the Tennessee Supreme Court in Kilpatrick v. Bryant, 868 S.W.2d 594, 599 (Tenn. 1993):

---

[3]In Tennessee, the element of causation as it applies to a claim for negligence encompasses two separate and distinct concepts: cause-in-fact and proximate cause. See Kilpatrick v. Bryant, 868 S.W.2d 594, 598-99 (Tenn. 1993). Proximate cause has not been raised as an issue in this case and will not be discussed.

9

... the mere occurrence of an injury does not prove negligence, and an admittedly negligent act does not necessarily entail liability. Doe, 845 S.W.2d at 181. Even when it is shown that the defendant breached a duty of care owed to the plaintiff, the plaintiff must still establish the requisite causal connection between the defendant's conduct and the plaintiff's injury. Id. ("Proof of negligence without proof of causation is nothing").

In order to prove causation, plaintiff must prove that defendant's negligence more likely than not caused plaintiff's injury. Kilpatrick, 868 S.W.2d at 598-99 ("the rule requiring causation be proven by a preponderance of the evidence dictates that Plaintiffs demonstrate that the negligence more likely than not caused the injury"); Lindsey v. Miami Dev. Corp., 689 S.W.2d 856, 861 (Tenn. 1985) ("[p]laintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result."); Boburka v. Adcock, 979 F.2d 424, 429 (6th Cir.1992) (holding a plaintiff in a medical malpractice case in Tennessee must "prove that it is more likely than not that the defendant's negligence caused plaintiff to suffer injuries which would have not otherwise occurred.")  In a discussion which is very apropos to the case at hand, the Tennessee Supreme Court in Kilpatrick discussed in some detail the degree of proof sufficient and *not* sufficient to prove causation in a medical malpractice case:

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. *A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant....*
>> The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not....  A doctor's testimony that a certain

10

> thing is possible is no evidence at all. His opinion as to what is
> possible is no more valid than the jury's own speculation as to what
> is or is not possible. Almost anything is possible, and it is thus
> improper to allow a jury to consider and base a verdict upon a
> 'possible' cause of death. (Citation omitted). The mere possibility
> of a causal relationship, without more, is insufficient....
>
> Lindsey, 689 S.W.2d at 861–62. Thus, proof of causation equating to a
> "possibility," a "might have," "may have," "could have," is not sufficient, as a
> matter of law, to establish the required nexus between the plaintiff's injury and the
> defendant's tortious conduct by a preponderance of the evidence in a medical
> malpractice case. *Causation in fact is a matter of probability, not possibility, and
> in a medical malpractice case, such must be shown to a reasonable degree of
> medical certainty.* White v. Methodist Hosp. South, 844 S.W.2d 642, 648–49
> (Tenn.App.1992).

Kilpatrick, 868 S.W.2d at 602.

The uncontroverted facts in this case are these:

Plaintiff was an intravenous drug user for at least four years in the 1970's. Persons who were intravenous drug users during that time period have a 70% to 90% Hepatitis C infection rate. Plaintiff tested positive for Hepatitis C markers in 1995 indicating plaintiff had Hepatitis C. The false positive rate for such tests among those who are intravenous drug users is about 15%. No confirmation testing or Hepatitis C counseling or treatment was given at that time. On June 26, 2007, plaintiff underwent a colonoscopy. Considering the evidence in the light most favorable to the plaintiff, there is also evidence to support the following:

> During a review of colonoscopy procedures at the Alvin C. York facility, it was
> determined that one of the tubes used for irrigation during the procedure had an
> incorrect valve. Use of an incorrect valve creates a possibility that patients
> undergoing these procedures could have been exposed to a small amount of bodily
> fluid remaining from the previous patient's procedure. Additionally, it was
> discovered that the tubing attached to the scope (not the scope itself) may not have
> been properly cleaned between patients.

11

(April 9, 2009 United States Department of Veterans' Affairs, Doc. 30-11, Page ID # 139). In 2008, plaintiff suffered from hallucinations and suicidal ideations; plaintiff had been treated for depression with psychotic features prior to this incident. In 2009, plaintiff tested positive for Hepatitis C.

There is *no* direct evidence in the record to support a finding that the equipment used for plaintiff's colonoscopy was contaminated with the Hepatitis C virus (HCV). Nor is there any evidence in the record of the *likelihood* that the equipment was contaminated with the Hepatitis C virus (HCV). Furthermore, there is no means by which one can make an educated estimate as to the likelihood that the equipment was contaminated because there is no evidence in the record of the rate of Hepatitis C infection among the general population, assuming, of course, that the rate of infection in the general population would be the same as the rate of infection among the population of persons who undergo colonoscopies.

Based on the uncontroverted facts in the record, and construing those facts which are controverted in the light most favorable to the plaintiff, the Court concludes that under no circumstances could the plaintiff prove that it is more probable than not that he contracted Hepatitis C from the June 26, 2007 colonoscopy procedure. It is *possible* that he contracted it from the colonoscopy in 2007, but it is more likely that he contracted it during his years of intravenous drug use in the 1970's.

While Dr. Schuster attempts to justify his conclusion than plaintiff contracted Hepatitis C from the colonoscopy, his explanations are not logical. Dr. Schuster opined that "the positive Hepatitis C Ab [in 1995] does not prove the patient had Hepatitis C in September 2, 1995 because the rate of false positive tests for Hepatitis C using the HEPCAB test is "15% or more;"

12

no confirmation test for Hepatitis C was given; he received no treatment or counseling for Hepatitis C or notice that he had tested positive for Hepatitis C antibodies; and none of plaintiff's VA medical records mention a history of Hepatitis C until 2009 when it is mentioned as a "new case." However, if a HEPCAB test has a false positive rate of 15% to 35%, then it also has a correct positive rate of 85% to 65%. The fact that plaintiff was not informed of the positive HEPCAB and HCVAB tests and was not counseled or offered treatment does not indicate the tests were invalid. It indicates the VA's follow-up procedures in 1995 were sorely lacking.[4] Dr. Schuster also links plaintiff's mental break-down in 2008 to the colonoscopy in 2007. However, there is no medical reason offered as to why such a correlation is significant in determining the cause of plaintiff's Hepatitis C . In any event, even if there were such an explanation, there is no explanation as to how the 2008 breakdown was different from the depression and psychotic features plaintiff suffered before the colonoscopy. Finally, plaintiff's own expert stated that he could not testify to a reasonable degree of medical certainty that plaintiff had a greater risk of contracting Hepatitis C from his 2007 colonoscopy than from his intravenous drug use in the 1970's.

---

[4]The government argues that plaintiff left the hospital against medical advice before the test results could come back which is why he was not notified of them. This may or may not be so, but either way it does not shed light on the actual accuracy of the test results.

## III. Conclusion

The Court therefore concludes that, considering all evidence in the light most favorable to the plaintiff, no reasonable factfinder could conclude it is more probable than not that plaintiff contracted Hepatitis C from the colonoscopy he underwent on June 26, 2007. Accordingly, plaintiff cannot establish the causal element of medical malpractice as required under the TMMA, and defendant is entitled to judgment as a matter of law. The defendant's motion for summary judgment is hereby GRANTED. Judgment shall be entered in favor of defendant.

                                                             s/William B. Mitchell Carter
                                                             UNITED STATES MAGISTRATE JUDGE